UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 2010-336 (WOB-JGW)

ANGELA POWELL-PICKETT                                    PLAINTIFF

VS.                        <u>MEMORANDUM OPINION AND ORDER</u>

AK STEEL CORPORATION                                     DEFENDANT


        This matter is before the Court on the motion of defendant
for summary judgment (Doc. 37), the motion of defendant to
strike the declaration of plaintiff Angela Powell-Pickett (Doc.
53), and the motion of plaintiff for leave to file the
declaration of Lucy Freeman (Doc. 55).

        The Court heard oral argument on these motions on September
20, 2012, and thereafter took them under submission (Doc. 58).

        Having reviewed this matter further, the Court now issues
the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

        On February 28, 2006, defendant AK Steel Corporation's
collective bargaining agreement with the Armco Employees
Independent Federation expired, and AK Steel lawfully locked out
the union.  Amy Hull Declaration at ¶¶ 1, 2, attached as Ex. B
to Doc. 37.  Plaintiff Angela Powell-Pickett, an African-
American female, was hired as a temporary replacement worker on

May 3, 2006.  *Id*. at ¶ 3.  Prior to her employment, Plaintiff
was required to pass a physical examination and complete a
medical history questionnaire.  *Id*.  In part, the medical
history questionnaire asks the applicant for any prior medical
issues and any prior workplace injuries.  *Id*. at Attachment 1.
Plaintiff did not list any prior medical issues or any prior
workplace injuries.  *Id*.  A number of former AK Steel employees
describe the medical examination process as "rushed" or
"hurried."  *See* Joe Lee Quarles Declaration at ¶ 6 – Doc. 51;
Bryant Pickens Declaration at ¶ 4 – Doc. 47-1; Anthony Webb
Declaration at ¶ 6.  Additionally, Plaintiff, and other former
employees, state that a nurse assisting the medical examinations
advised the prospective employees to only include five (5) years
of medical history.  *See* Deposition of Angela Powell-Pickett, Volume
III at 70; Quarles Decl. at ¶ 6; Pickens Decl. at ¶ 4.

AK Steel has various steel manufacturing "lines" that
require inspection, and the lines run days, nights, and
weekends.  Plaintiff worked on the "pickler" line.  Inspectors
like Plaintiff reported to the "shift manager/supervisor," who
in turn reported to William Belding, a higher-level supervisory
manager.[1]  *See* William Belding Declaration at ¶¶ 1-3 - Doc. 54-

---

[1] The declarants and parties refer to Belding with different titles.  (See,
e.g., Doc. 37 at 4 ("supervisor in the inspector group"); Belding Decl. at ¶
1 ("Manager-Product Integrity"); Webb Decl. at ¶ 3 ("Department Manager of
Quality Control")).

2; Webb Decl. at ¶ 7.  "Shift manager" is AK Steel's "first level salaried position."  *See* Doc. 37 at pg. 3.

The lockout lasted until March 15, 2007, when a new collective bargaining agreement was reached and the regular employees began to return to the steel mill.  Hull Decl. at ¶ 2. On July 8, 2007, Plaintiff reapplied to be hired as a regular full-time employee, and Belding selected her for hire.  She remained working in her same "inspector" capacity.  *See, e.g.,* Complaint at ¶ 15; Doc. 35-3 at 46-54 (Exhs. 32-35); Belding Decl. at ¶ 3; Webb Decl. at ¶¶ 8-9.  As part of her application to become a full-time employee, Plaintiff asserts that she was required to take a new physical.  Doc. 47 at pg. 6.  Plaintiff claims that she disclosed her medical issues to the doctor at this second physical examination. *Id*.

Shortly after she became a full-time employee, in September 2007, Plaintiff applied to Belding for a shift-manager position. Doc. 35-3, Ex. 36.  It was around this same time that Plaintiff claims she began to experience racial and sexual discrimination at AK Steel.  Specifically, the declarations submitted by Plaintiff describe three specific instances of harassment towards Plaintiff: (1) an incident where an unidentified co-

worker ran his fingers through Plaintiff's hair;[2] (2) co-workers
placed a bottle of urine on an air conditioner above Plaintiff's
work station so the bottle would leak on her;[3] and (3) a noose
made out of electrical tape was placed above Plaintiff's chair.[4]
As for specific comments, Anthony Webb, a former shift manager
at AK Steel, recalls that after the strike ended, shift manager
Tim Swindell called Plaintiff "Buckwheat" and this manager and
another spread rumors that Plaintiff formerly worked as a
"hooker in Alaska." Webb Decl. at ¶ 13. Lucy Freeman, a former
temporary worker at AK Steel, stated that, after the strike
ended, racially derogatory comments appeared on the wall of the
"unisex bathroom in the manager's area . . . 'nigger,' 'go back
to Africa,' 'monkeys.'" Lucy Freeman Declaration at ¶ 10.
Lastly, Bryant Pickens, who, like Plaintiff, was later hired as
a regular employee, asserts that, while he was a temporary

---

[2] *See* Pickens Decl. at ¶ 11 ("complained about his touching her hair [and]
[w]hen she told the supervisor he merely laughed. This was common knowledge
among the workers and I heard the supervisor . . . joking about it with
others."); Freeman Decl. at ¶ 8 ("supervisory level male running his hands
through her hair").

[3] *See* Pickens at ¶ 13 ("bottles of urine being secretly placed on an air
conditioner above where [she] was seated so it would splash on her when
operations would shake the chamois."); Freeman Decl. at ¶ 8 ("a bottle of
urine was placed in the dropped ceiling above [Plaintiff's] workstation . .
.causing us to think the liquid dripping down on her (and me) was from the
air conditioning . . .").

[4] *See* Pickens Decl. at ¶ 13; *see also* Freeman Decl. at ¶ 8 ("a noose was
placed in [Plaintiff's] work booth").

worker, "Caucasian supervisors, as well as Department Manager Bill Belding, frequently ma[de] racially derogatory statements loud enough for black African American workers (like myself) to hear." Pickens Decl. at ¶ 11. Pickens does not specify the nature of these comments and, in particular, does not mention what Belding said.

In late November of 2007, Plaintiff alleges that Belding altered her work schedule and she was demoted to the position of "floater." *See* Doc. 1 at ¶ 22; Hull Decl. at ¶ 6. Shortly thereafter, on January 18, 2008, Belding awarded the shift-manager position Plaintiff had applied for to Ramenia Chisholm, an African-American female who was also a former temporary worker. Belding Decl. at ¶ 2; Hull Decl. at ¶ 5. That same day, Plaintiff lodged a complaint with AK Steel's Ethics Hotline alleging Belding passed over her due to favoritism for Chisholm. Hull Decl. at ¶ 5; Powell-Pickett Depo. Volume III at 82 (stating that Belding discriminated against her because, "[h]e trained Ramenia"). Amy Hull, a representative in AK Steel's Labor Relations Department, states that AK Steel conducted an investigation and found no merit to the complaint. *Id.*

On March 27, 2008, Plaintiff filed an EEOC charge.[5] *Id.* at ¶ 6. According to Hull's declaration and an email attachment that summarizes Plaintiff's "issues," her EEOC charge included complaints about scheduling, not being selected for the shift-manager position, and retaliation for lodging a complaint with the Ethics Hotline. *Id.* at ¶¶ 5-7; Belding Decl. (Ex. A, email from Belding dated 11/12/2008 and from Hull dated 10/6/08). A few months after Plaintiff filed her EEOC charge, Anthony Webb sent an email to Bill Belding, Greg Glodowski, and Kelly Higgins, reporting a number of complaints on Plaintiff's behalf. Doc. 48-2. These complaints all referenced Plaintiff's perceived unfairness in scheduling.[6] *Id.*

---

[5] There is some ambiguity in the record as to when Plaintiff filed her EEOC charge. *See* Hull Decl. at ¶ 6 (claiming that Plaintiff filed her EEOC charge on March 27, 2008); Complaint at ¶ 22 (stating Plaintiff filed an EEOC charge in March of 2008); *compare* Powell-Pickett Decl. at ¶ 7 (claiming she filed her EEOC charge on December 6, 2007). Plaintiff confirmed in her responsive memorandum that she filed her first EEOC charge "[a]fter the promotion of Ms. Chisholm." *See* Doc. 47 at pg. 9. Chisholm's promotion occurred on January 18, 2008, which indicates that the date of the filing of the EEOC charge was March 27, 2008.

[6] Webb's email stated:

> Angela Powell-Pickett says she feel (sic) she is not being treated fairly. She want (sic) to know why she is consistantly (sic) scheduled on #5 Pickler, which pays less than any other unit. A unit which don't (sic) run half the time. She also want (sic) to know why she is and has been bounced around, when there are six people with less seniority. She also want (sic) to know why she has to request a long weekend off when other inspectors are granted one automatically. She said she did not ask for two O.B.P. days. She asked to be scheduled off. She said, while considering not having constructive training in the department, she has done everything AK has asked of her in inspecting on the other units with no problems.

On September 12, 2008, Plaintiff submitted a request for leave under the Family Medical Leave Act (FMLA). *See* Doc. 48-4. Plaintiff's doctor recommended FMLA leave from 9/10/2008 until 9/26/2008 because Plaintiff's daughter had surgery to repair an ACL tear in her knee. *Id*. Plaintiff's doctor also recommended intermittent FMLA leave for 6 additional months so that Plaintiff could take her daughter to and from physical therapy appointments. *Id*. The doctor suggested that Plaintiff would need the intermittent leave 1-2 times per month for 6 months. *Id*. Plaintiff claims that she was thereafter denied FMLA leave for that purpose. *See* Doc. 47 at pg. 12; Webb Decl. at ¶ 32.

On September 30, 2008, Plaintiff complained directly to Hull that she was being harassed and retaliated against because she was a replacement worker. *See* Hull Decl. at ¶ 7. Hull states that she met again with Plaintiff on October 3, 2008, so that she could further understand Plaintiff's complaints. *Id*. Hull asserts that she investigated the complaints, and on December 22, 2008, she informed Plaintiff that she had not uncovered a violation of any policy. *Id*.

Eventually, on January 27, 2009, the EEOC invited Plaintiff and AK Steel to a mediation in reference to the charge she had filed in March of 2008. *See* Hull Decl. at ¶ 8. At this mediation, the parties executed a settlement where Plaintiff

agreed not to initiate a lawsuit and AK Steel agreed the EEOC proceedings "will not be held against her regarding future assignments and career development." *Id.*, Ex. 2.

Beginning February 27, 2009, Plaintiff took a leave of absence based on Dr. Terrence Conti's assessment that several physical and mental conditions would render her "totally disabled" for a month, but "able to return to work 3/28/09." Doc. 35-3 at 3 (Ex. 10).[7] She also "applied for benefits under the company's Sickness & Accident policy." Complaint at ¶ 24. Prior to her return to work, and pursuant to AK Steel's policy, a company physician examined Plaintiff on March 23, 2009. *See* Hull Decl. at ¶ 9. At this examination, Plaintiff disclosed to the examining physician that she had a thyroid issue and that she previously had a cyst removed. *Id*. Additionally, Plaintiff disclosed a prior work-related injury she had sustained while employed with General Electric. *Id*.

Shortly after being notified of the inconsistencies in the medical questionnaire, Plaintiff was suspended and, on April 15, 2009, AK Steel terminated her for the same reason. Soon thereafter, Plaintiff filed a charge with the EEOC in regards to her termination from AK Steel. Plaintiff's union also

---

[7] Dr. Conti diagnosed her with "irritable bowel syndrome, chronic back pain, spinal stenosis, and anxiety neurosis." (Doc. 35-3 at 3).

challenged AK Steel's decision to terminate her, but it did not take the matter to arbitration. *Id.* at ¶¶ 11-13; *see also* Complaint, ¶¶ 27-29.

According to Hull, during the almost decade preceding Plaintiff's termination, AK Steel has discharged a total of twenty-nine employees for "falsification." This group includes: twenty-one white males; six white females; one African-American male; and one African-American female, Plaintiff. *See* Hull Decl. ¶ 10; Doc. 54-1 at 1-2, ¶ 2 ("Hull Supp. Decl.") *compare* Pickens Decl., ¶ 7 ("While working at AK Steel, I had regular contact with numerous temporary employees and none were questioned, disciplined or terminated because of any discrepancies with their job application process.").

On May 24, 2010, Plaintiff filed this action, alleging she was treated less favorably, subjected to harassment and retaliation, and ultimately terminated based on her race, gender, disability, and/or protected activity. Her fifteen-count Complaint raises claims under various federal statutes, Ohio's counterparts to those statutes, and for breach of an EEOC settlement agreement. *See* Doc. 1. A year after filing the Complaint and one request for an extension of the discovery deadlines by Plaintiff, the parties were scheduled to take Plaintiff's deposition on June 26, 2011. *See* Doc. 9; Deposition

of Angela Powell-Pickett Volume I.  During Plaintiff's first
deposition, defense counsel immediately began to ask Plaintiff
questions regarding some inconsistencies in Plaintiff's
recently-filed bankruptcy petition.  After only approximately a
half-hour, Plaintiff took a break, fainted, and was taken to the
hospital.  *See* Plf. Depo. at 23, 28.

On September 7, 2011, Plaintiff's counsel was granted leave
to withdraw.  *See* Doc. 18.  The Court also ordered Plaintiff to
notify it on or before November 7, 2011, whether she had
obtained new counsel or intended to proceed pro se.  *Id*.  After
receiving a letter from Plaintiff stating she was unable to
obtain new counsel, the Court ordered on November 3, 2011, that
Plaintiff would proceed pro se.  *See* Doc. 19.  Shortly
thereafter, Defendant sent Plaintiff two letters offering dates
to resume her deposition.  *See* Doc. 21, attachment 1.  After
receiving no response, Defendant sent Plaintiff a Notice of
Deposition for November 23, 2011.  *Id*., attachment 2.  Plaintiff
failed to appear for this deposition.  *Id*.

Shortly thereafter, Plaintiff filed a Motion to Appoint
Counsel.  *See* Doc. 22.  On December 13, 2011, the Court denied
the motion and ordered Plaintiff to participate in discovery,
including appearing at her deposition.  *See* Doc. 24.  The
parties agreed on December 20, 2011, and Plaintiff appeared, pro

se, at this deposition. *Id; See also* Powell-Pickett Depo. Volume III. At this deposition, defense counsel questioned Plaintiff about inconsistencies in her bankruptcy petition and other prior misrepresentations to the Ohio Department of Job and Family Services. *See id.* at 39-60. Additionally, during this deposition, defense counsel introduced Exhibit 8 and used it to establish that she was discharged on an earlier date than what she represented in her bankruptcy filing. *Id*. at 34-36. Exhibit 8 to Plaintiff's deposition consists of an undated, handwritten list of reasons why Plaintiff believes she was subjected to discrimination, harassment, and retaliation. *See* Doc. 35-3 at 1 (Exh. 8) ("Plf. Exhibit 8"). As the deposition continued, defense counsel asked Plaintiff about the bases for each of her specific claims. *See id*. at 61-85. Plaintiff responded substantively to some questions, but mostly was uncooperative and responded that she "could not recall at this time" the basis for her claims. *Id*.

Plaintiff's second counsel entered his appearance on January 3, 2012, and the Court ordered the discovery deadline extended until February 29, 2012. *See* Doc. 26; Doc. 31. Defendant filed its Motion for Summary Judgment on March 14, 2012, and Plaintiff, after receiving extensions, filed her response on May 10, 2012. *See* Doc. 37; Doc. 47. In addition to

her response, Plaintiff also filed declarations from Anthony

Webb (Doc. 48), Bryant Pickens (Doc. 47-1), Joe Lee Quarles

(Doc. 51), and herself (Doc. 50). Shortly thereafter, Defendant

filed its reply in support of summary judgment and a motion to

strike Plaintiff's affidavit. *See* Doc. 53; Doc. 54.

Approximately five weeks later, Plaintiff filed a motion for

leave to file the declaration of Lucy Freeman in support of its

memorandum in opposition to summary judgment, to which Defendant

filed a response. *See* Doc. 55; Doc. 56.

On September 20, 2012, the Court held oral argument on all

pending motions, and thereafter took them under submission. At

oral argument, Plaintiff abandoned her disability claims under

Counts IX and X.

## **ANALYSIS**

### 1) **DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S DECLARATION**

Defendant argues that paragraphs 5-17 of Plaintiff's

declaration should be struck because they contradict her

deposition and attempt to create an issue of fact that did not

previously exist. *See* Doc. 53. Specifically, Defendant points

to pages 81-85 of Plaintiff's deposition where Plaintiff

continuously states that "[she] [doesn't] recall" the bases for

her claims. *Id.* at pgs. 1-4.

A party cannot create a disputed issue of material fact by filing a declaration that contradicts the party's earlier deposition testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006); *see also Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (establishing the general principle).

The inquiry for admissibility of a post-deposition affidavit in the Sixth Circuit is twofold. *See, e.g., O'Brien v. Ed Donnelly Enters., Inc.,* 575 F.3d 567, 593 (6th Cir. 2009). The Court must first determine if Plaintiff's declaration "directly contradicts" her deposition testimony and, if so, whether she "provides a persuasive justification for the contradiction." *Aerel,* 448 F.3d at 908; *see also O'Brien,* 575 F.3d at 593. If the declaration is not directly contradictory or if a Plaintiff gives a sufficient justification, then the only basis to strike the declaration is if the Court determines that it "constitutes an attempt to create a sham fact issue." *Id.* (quoting *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986)(internal quotations omitted)).

Citing to the Tenth Circuit decision in *Franks,* the Court in *Aerel* noted that the existence of a sham fact issue turns on "whether the affiant was cross-examined during [her] earlier testimony, whether the affiant had access to the pertinent

13

evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.*

Although she has not filed a formal response to Defendant's Motion to Strike her declaration, Plaintiff argued in her response to Defendant's Motion for Summary Judgment,

> ". . .that [the] deposition needs some context. [Plaintiff] was alone (sic) without counsel and against a seasoned and talented attorney who took full advantage of the unequal position by hammering through the first half of the deposition at discrepancies in [a] medical record of a doctor who has shut his practice and disappeared and a bankruptcy [petition] [and] went to great effort to cast . . . aspersions on [her] character for truthfulness."

Doc. 47 at pg. 1. Plaintiff also directs the Court's attention to Exhibit 8 of her deposition, which is a handwritten list of allegations and statements regarding Plaintiff's claims, arguing that Defendant should have cross-examined her about each of the allegations on this document. *Id.* at 1-2.

Although the Court takes note that Plaintiff was unrepresented at this deposition, Plaintiff's reason for contradicting her deposition testimony is not a persuasive justification. As noted in the procedural history of this case,

this was not Plaintiff's first attempted deposition in this matter.  Additionally, the questions asked by defense counsel were direct, pointed questions about what evidence Plaintiff had to support her numerous claims.  Moreover, as evidenced by Exhibit 8 to her deposition, Plaintiff's assertions in her declaration were not based on newly discovered evidence.  The document was fragmented and unorganized.  In essence, the Plaintiff's continual answering, "[I] don't recall" to questions designed to clarify her own testimony amount to a refusal to testify.

If Plaintiff knew the bases for her claims, she "was required to say so at [her] deposition when [she] was specifically questioned on the subject." *Preston v. Clayton Homes, Inc.*, 167 F. App'x 488, 491-92 (6th Cir. 2006)(citation omitted); *see also Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001)(excluding plaintiff's statement as contradictory when he testified in his deposition that he had *no* other opinions regarding the defendant's duty to warn).

Thus, the factors outlined in *Aerel* weigh in favor of the Defendant.  Therefore, paragraphs 5-17 of Plaintiff's declaration are hereby ordered struck from the record.

**2) <u>PLAINTIFF'S CLAIM FOR RACIALLY HOSTILE WORK ENVIRONMENT</u>**

Federal and Ohio hostile work environment claims are analyzed identically. *See, e.g., Satterfield v. Karnes,* 736 F. Supp. 2d 1138, 1157 (S.D. Ohio 2010); *Young v. Dayton Power and Light Co.,* No. 1:11-cv-119, 2012 WL 1680100, at **4-5 (S.D. Ohio May 14, 2012). To succeed, Plaintiff must establish that: (1) she is an African-American, (2) was subjected to unwelcome racial harassment, (3) the conduct constituting harassment was based on race; (4) the harassment created a "hostile work environment" as that phrase is defined; and (5) there is a basis to impose liability on AK Steel. *See, e.g., Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 706 (6th Cir. 2007) (citing *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999)). Defendant does not take issue with whether the conduct in fact occurred, and instead focuses on the fourth and fifth elements.

There are slightly different standards for evaluating whether an employer is liable for a hostile work environment. In the case of a harassing co-worker, "[a]n employer is liable if it knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Clark v. United Parcel Serv., Inc.,* 400 F.3d 341, 348 (6th Cir. 2005) (citing *Hafford v. Seidner,* 183 F.3d 506, 513 (6th. Cir. 1999) (internal quotation marks omitted)). By contrast, "an

employer is vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* (citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 663 (6th Cir. 1999)).

### a. Supervisor Harassment

Here, the allegations of supervisor harassment include Pickens' contention that Belding "frequently" made "racially derogatory" comments loudly enough for employees to overhear (Pickens Decl. at ¶ 11); Webb's contention that Swindell, a shift manager, referred to Plaintiff as "Buckwheat" (Webb Decl. at ¶ 13); and the allegations that an unknown supervisor ran his fingers through Plaintiff's hair. *See* Pickens Decl. at ¶ 11.

A "hostile work environment plaintiff needs to allege sufficient specificity as to the time, place, and context of alleged discriminatory statements to create a genuine issue of material fact." *Reynolds v. Federal Express Corp.,* No. 09–2692–STA–cgc, 2012 WL 1107834, at *13 (W.D. Tenn. Mar. 31, 2012)(citation omitted). Pickens' bald assertion that Belding would "frequently" make "racially derogatory" remarks lack the specificity required to establish a hostile work environment. Additionally, Plaintiff states in her deposition that she felt Belding discriminated against her "[b]ecause [she] was a replacement worker." Powell-Pickett Depo. at 81. There is no

17

allegation that Plaintiff felt Belding discriminated against her because of her race.

The remaining allegations of supervisor harassment are not sufficiently severe or pervasive to find a hostile work environment based on supervisor conduct. Occasional offensive utterances are not sufficiently severe or pervasive to create a hostile work environment. *Grace v. USCAR,* 521 F.3d 655, 679 (6th Cir. 2008); *see also Williams v. CSX Transp. Co., Inc*., 643 F.3d 502, 513 (6th Cir. 2011) (finding that "calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should go back to where [they] came from are certainly insensitive, ignorant, and bigoted. But they more closely resemble a mere offensive utterance than conduct that is physically threatening or humiliating.")(internal quotations and further citation omitted); *Valentine-Johnson v. Roche,* 386 F.3d 800, 814 (6th Cir. 2004) (holding that one incident of touching was not sufficiently frequent, severe, physically threatening, or humiliating to constitute a hostile work environment even though coupled with sexually suggestive comments).

### b. Co-Worker Harassment

An employer is vicariously liable for co-worker harassment of which it knew or should have known if it failed to take appropriate remedial action, *i.e.*, if its response manifests

indifference or unreasonableness. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009) (citing *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 338 (6th Cir. 2008); *McCombs v. Meijer, Inc.,* 395 F.3d 346, 353 (6th Cir. 2005)). To establish that the employer "knew or should have known" of the co-worker harassment, the plaintiff need not necessarily have reported it to a supervisor. *Id.* (further citation omitted). Where harassment is pervasive, knowledge may be imputed to the employer. *Id.* (further citation omitted).

Plaintiff has offered no evidence herself, or through her declarants, that she reported either the incident involving the bottle of urine or the incident involving a noose made of electrical tape to anyone at AK Steel. An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized - or is reasonably believed by a complaining employee to have been authorized - to receive and respond to or forward such complaints to management. *Gallagher*, 567 F.3d at 277 (citing *Bombaci v. Journal Community Pub. Group. Inc.,* 482 F.3d 979, 984 (7th Cir. 2007)). AK Steel annually distributes its Equal Opportunity Policy Statement which prohibits discrimination in hiring, training, promotion, and the like, and specifically provides that "[h]arassment is not tolerated in the workplace and violators are subject to

appropriate discipline." Doc. 54-1 at 4. That policy also requires violations to be reported "immediately" to specified human resource personnel or to a "hotline." *Id.* It is undisputed that Plaintiff had used this "hotline" in January of 2008 to report her allegation that she was discriminated against in regards to AK Steel's decision not to promote her. However, Plaintiff has offered no evidence that she reported either the urine or noose incident to anyone in management or through use of AK Steel's "hotline." Plaintiff and her declarants do assert that Plaintiff complained, but their statements refer to Plaintiff's complaint about an unidentified supervisor touching her hair, or their statements lack specificity altogether about Plaintiff's alleged complaints.[8]

The remaining allegations of racial harassment are not pervasive enough to impute liability to AK Steel. The remaining allegations include when Plaintiff was called "Buckwheat"; an unidentified co-worker running his fingers through Plaintiff's hair; the derogatory comments Pickens alleges were made by Belding; and the racial graffiti written on the walls of a unisex bathroom. Initially, it should be noted that Plaintiff

---

[8] *See* Quarles Decl. at ¶ 8 ("Management was certainly aware. . ."); Freeman Decl. at ¶ 8 (. . ."male running his fingers through her hair. Angela reported this incident. . . [s]he reported other incidents. . ."); Pickens Decl. at ¶ 11 ("Angela complained about him touching her hair."); Webb Decl. at ¶ 11, 13 (". . .when Angie would complain. . .", "Angie first complained. . . after Ms. Chisholm was given a shift manager job. . .").

has offered no evidence that she was aware of the alleged racial graffiti written on the walls of a unisex bathroom, nor does Lucy Freeman state that this graffiti was reported to anyone. *See Burnett v. Tyco Corp.,* 203 F.3d 980, 981 (6th Cir. 2000) (concluding that evidence was not relevant to the plaintiff's hostile-work-environment claim because there was no evidence that the plaintiff was aware of the conduct at the time). Moreover, the allegations with regards to Belding and Plaintiff's handwritten document attached as Exhibit 8 to her deposition lack specificity in regards to time, place, or frequency of the alleged occurrences. The Court cannot use this allegation as a basis to find that the racial harassment was so pervasive as to impute liability to AK Steel. *See Cooper,* 742 F.Supp.2d at 956; *see also Ladd v. Grand Trunk W. R.R., Inc.,* 552 F.3d 495, 501 (6th Cir. 2009) ("[Plaintiff] has alleged that she was subject to derogatory sex-based comments on a daily basis, but without specifics it is difficult to adjudge their severity.").

Each of the other allegations, although severe as they may be, was only alleged to have happened to Plaintiff or, in the case of the urine bottle and the noose, in her immediate work space. Furthermore, besides the declarants' conclusory statements that AK Steel was a "hostile work environment" and

Lucy Freeman's allegations of racial graffiti, no other declarant asserts any occurrences of racial harassment in the workplace. The fact that this steel plant employs nearly 2,000 people, combined with the isolated nature of these remaining allegations, does not allow for a finding that knowledge of these allegations can be imputed to AK Steel.

Therefore, Plaintiff cannot establish the fifth element required for a showing of a racially hostile work environment. Thus, there are no issues of material fact upon which a reasonable jury could find that Plaintiff has established a prima facie case for a racially hostile work environment.

### c. Sufficiently severe or pervasive work environment

Even if Plaintiff was able to show that Defendant knew or should have known of the harassment, Plaintiff cannot establish that the alleged harassment was sufficiently severe or pervasive so as to alter the conditions of her work environment. Under the fourth prong outlined above, the applicable "test for a hostile work environment has both objective and subjective components." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999). In order to establish the subjective component, Plaintiff must "subjectively perceive the environment to be abusive." *Id*. (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

At her deposition, Plaintiff testified that she "[did not]
recall" the bases for her claim that she was harassed because of
her race. *See* Powell-Pickett Depo. at 85. Without any evidence
establishing that she subjectively perceived the environment at
AK Steel to be abusive, Plaintiff cannot prove a prima facie
case for racially hostile work environment.

Therefore, Plaintiff also cannot establish the fourth
element required for a showing of a racially hostile work
environment. Thus, there are no issues of material fact upon
which a reasonable jury could find that Plaintiff has
established a prima facie case for a racially hostile work
environment.

### 3) PLAINTIFF'S CLAIM FOR SEXUALLY HOSTILE WORK ENVIRONMENT

"Hostile work environment claims based on racial harassment
are reviewed under the same standard as those based on sexual
harassment." *National R.R. Passenger Corp. v. Morgan,* 536 U.S.
101, 116 n. 10 (2002); *see also Jackson v. Quanex Corp.,* 191
F.3d 647, 658 (6th Cir. 1999) (same). To determine whether
harassment is sufficiently severe or pervasive to constitute a
hostile work environment, the court must consider the totality
of circumstances. *Williams*, 187 F.3d at 562 (citing *Harris*, 510
U.S. at 23). However, for a sexually hostile work environment
claim, the third prong of the prima facie case requires the

plaintiff to establish that the harassment was based on sex.
*See, e.g., Randolph v. Ohio Dept. Of Youth Services*, 453 F.3d
724, 733-34 (6th Cir. 2006).

To establish that conduct was "based on her sex," a
plaintiff "must show that but for the fact of her sex, she would
not have been the object of harassment." *Williams*, 187 F.3d at
565 (citing *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th
Cir. 1982)).  In this case, the declarations submitted by
Plaintiff indicate that the harassment was targeted at all
African-Americans, not specifically females.  *See* Webb Decl. at
¶ 12 ("racial differences made things worse.  It was an
extremely hostile work environment."); Pickens Decl. at ¶ 11
("frequently make racially derogatory statements loud enough for
black African-American workers to hear. . ."); Quarles Decl. at
¶ 8 ("I decided not to reapply because of what I perceived as a
racially hostile environment."); Freeman Decl. at ¶ 10 ("[o]n
the wall were many racially derogatory comments directed at
blacks. . .").

The only alleged incidents which could be considered as
"based on her sex" were the unknown supervisor running his hands
through Plaintiff's hair, and a rumor that Plaintiff was
previously a "hooker in Alaska." *See* Pickens Decl. at ¶ 11; Webb
Decl. at ¶ 13.  These two incidents are not sufficiently severe

or pervasive so as to constitute a sexually hostile work environment. *See, e.g., Valentine-Johnson v. Roche,* 386 F.3d 800, 814 (6th Cir. 2004) (holding that one incident of touching was not sufficiently frequent, severe, physically threatening, or humiliating to constitute a hostile work environment even though coupled with sexually suggestive comments).

Therefore, Plaintiff cannot show that the alleged sexual harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Williams*, 187 F.3d at 560, 562. Thus, there are no issues of material fact upon which a reasonable jury could find that Plaintiff has established a prima facie case for a sexually hostile work environment.

### 4) <u>PLAINTIFF'S CLAIMS FOR RACE AND GENDER DISCRIMINATION</u>

To make a prima face showing of discrimination, Plaintiff must establish that she (1) is a member of the protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Lattimore v. Wild Flavors, Inc.*, No. 2:09-cv-023-WOB-JGW, 2012 WL 208078, at *10 (E.D. Ky. Jan. 23, 2012) (and cases cited therein); *see also, e.g., Henry*

*v. Delta Air Lines,* No. 2:10-cv-00009-WOB-JGW, 2011 WL 3444089, at *7 (E.D Ky. Aug. 8, 2011) (same).

Plaintiff alleges three types of "adverse action" – promotion, scheduling, and termination.  Termination qualifies as "adverse," as does "failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Spees v. James Marine, Inc.,* 617 F.3d 380, 391 (6th Cir. 2010) (internal quotations and citations omitted).  Here, the declarants assert that the lines and shifts to which an employee was assigned affected the amount of money the employee could make.  Less favorable financial consequences also qualify. *See Santana v. U.S. Tsubaki, Inc.,* 632 F. Supp. 2d 720, 722 (N.D. Ohio 2009) (citing *White v. Burlington Northern & Santa Fe Railway Co.,* 310 F.3d 443, 450 (6th Cir. 2002), for the proposition that "material adverse change includes a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation").

### a. Promotion

To establish a prima facie discrimination claim concerning the denial of a promotion, a plaintiff must show: (1) that he or

she is a member of a protected class; (2) that he or she applied for and was qualified for the promotion; (3) that he or she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004)(further citation omitted).

Since Plaintiff has put forth no evidence to meet the fourth prong above, she cannot establish a prima facie case for race or gender discrimination in regards to her promotion. Ramenia Chisholm, who is the same race and gender as the plaintiff, received the promotion to shift manager. In arguing that she was discriminated against in regards to AK Steel's failure to promote her, Plaintiff points to the fact that Chisholm is currently no longer employed as the shift manager. However, Plaintiff's argument that Defendant selected Chisholm for the shift manager position because it knew there was a likelihood that she would fail in that position is rank speculation. Not only does Plaintiff offer no evidence to support this contention, Defendant has proffered undisputed evidence that Chisholm is still employed at AK Steel and she voluntarily left the shift manager position so she could work as a day-shift employee. *See* Belding Affidavit at ¶ 2.

Therefore, Plaintiff cannot establish a prima facie case in regards to her claim that AK Steel's failure to promote her to shift manager was motivated by race or gender.

**b. Scheduling**

Plaintiff contends that, in November of 2007, Bill Belding demoted her to a "floater," and scheduled her in a way that was punitive or inconsistent with how others were treated and/or resulted in less pay. According to Plaintiff, her demotion to floater "removed" her from an unspecified position that a white male then filled. Presumably this male was Keith Higgins, the only person mentioned by name as having replaced Plaintiff.[9] There is no indication that Defendant disputes any of the first three elements of the prima facie case. Thus, construing all reasonable inferences in favor of Plaintiff, she can establish a prima facie case for race and gender discrimination.

However, Plaintiff has not rebutted Defendant's legitimate, non-discriminatory reason for Plaintiff's alleged demotion. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)

---

[9] Plaintiff has not been entirely clear about when she alleges that some of her duties were reassigned to Higgins. Plaintiff's Complaint provides that the "late 2007" removal and assignment as a "floater" was accompanied by replacement with an unidentified "less qualified Caucasian male." Complaint at ¶ 21. Plaintiff's declaration, however, states that Higgins replaced her in "January 2009," not 2007. *See* Powell-Pickett Decl. at ¶ 10 ("In January 2009, I was replaced by Keith Higgins (white male) less qualified; less seniority, Caucasian male.").

(citing *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)). A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009) (citation omitted). The plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the [defendant] intentionally discriminated against [her]." *Id.* (citing *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir. 2003)) (alteration in original). "The jury may not reject an employer's explanation ... unless there is a sufficient basis in the evidence for doing so." *Id.* (citation omitted).

Defendant asserts that Plaintiff's training as a full-time employee required her to be trained on a number of different "lines." In regards to this issue, Bill Belding stated:

> Powell-Pickett was never a 'floater' when she was employed as an inspector. We did not have floaters in inspection. During the lockout, temporary replacement workers brought in as inspectors generally were required only to work one of the various inspection lines. Powell-Pickett was an inspector on the Pickler line. The company did not want to invest the time or training during the lockout to make sure that these temporary inspectors knew all of the phases of the inspection jobs. Once the lockout

29

> ended, I selected Powell-Pickett to be
> employed as a regular, full-time employee.
> But as a regular, full-time employee, she
> had to learn more than just the Pickler line
> inspection and so we had her training on a
> number of different lines. Maybe she
> thought this was 'floating,' but this is the
> way that we train all our new inspectors.

*See* Belding Decl. at ¶ 3. Since Defendant has proffered a

legitimate, non-discriminatory reason for Plaintiff's altered

work schedule, the burden shifts to Plaintiff to show that this

reason was pretext for race or gender discrimination.

This is where Plaintiff's claim for race and/or gender

discrimination based on the changes in her schedule fails.

Plaintiff has proffered no evidence from which a jury could

reasonably reject Defendant's explanation and infer that the

Defendant intentionally discriminated against her. In fact,

Plaintiff explicitly stated in her deposition that she believed

Belding discriminated against her because she was a replacement

worker. *See* Powell-Pickett Depo. Volume III at 81. Thus,

Plaintiff's lack of evidence coupled with her own statement

regarding Belding's motivation for his alleged discrimination

provides no basis upon which a jury could reasonably reject

Defendant's legitimate, non-discriminatory reason for the change

in Plaintiff's work schedule.

Therefore, Plaintiff cannot establish that Defendant's legitimate, non-discriminatory reason for the change in her work schedule was pretext for race or gender discrimination.

### c. Termination

Similar to Plaintiff's claim for race and gender discrimination in AK Steel's failure to promote her, Plaintiff cannot establish the fourth prong of a prima facie case for discrimination in regards to her termination. Plaintiff cannot prove that she was replaced by an individual outside her protected class or that she was treated differently than a similarly-situated individual. Defendant has identified 29 individuals, the majority of which are Caucasian males, who were also terminated for falsification on the pre-hire medical questionnaire and other documents. *See* Hull Decl. at ¶ 10; Supplemental Hull Decl. at ¶ 2.

However, even if Plaintiff was able to establish a prima facie case of race and/or gender discrimination, she again could not rebut Defendant's legitimate non-discriminatory reason for her termination by showing that it was pretext. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (citing *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).

By basing her pretext argument on the allegations that a company nurse instructed her to only include any medical or

work-injury history within the past five (5) years and the allegation that she included her full history on a subsequent application, Plaintiff is alleging that AK Steel's reason for her termination has no basis in fact.[10]  Her primary focus on the nurse, however, is misplaced, because an issue of fact about the nurse's instruction does not undermine the fact that Plaintiff's initial medical questionnaire contains omissions.  The "honest belief" doctrine precludes Plaintiff from establishing pretext simply because AK Steel may have relied on a falsification that proves "incorrect."  *See, e.g,. Steele v. Oasis Turf & Tree, Inc.*, 1:10-CV-769-HJW, 2012 WL 3028514 at *10 (S.D. Ohio July 25, 2012); *Henry,* 2011 WL 3444089, at *10.

Plaintiff's allegation that she told a company physician about the omitted conditions, and filled out another questionnaire that has since gone missing, stands in the same

---

[10]  Plaintiff maintains she failed to fully disclose her prior health issues and work injuries because the nurse who was supervising the applicants specifically told them to only report their medical history and any work-related injuries which occurred within the past five (5) years.  Plaintiff's Complaint, her testimony, and her declarants support this contention.  *See* Complaint, ¶¶ 12-14; Pickens' Decl. at ¶ 4, 6; Powell-Pickett Depo. at 68; Quarles Decl. at ¶ 6; Webb Decl. at ¶ 6.
Plaintiff also maintains that when she was hired as a permanent worker, she underwent another physical examination by a company physician, and told him about her thyroid and . . . conditions.  Complaint, ¶¶ 16-17 ("Plaintiff again completed a medical history questionnaire . . . .  The doctor who assisted Plaintiff . . . gave [her] a different instruction with regard to the time frame for reporting. Consequently, Plaintiff reported a 1999 back injury and a thyroid condition that was treated in the early 1990s.").

posture.  Not only is this allegation unsupported,[11] if the later documentation listing certain conditions is missing, then AK Steel would not have been privy to it when uncovered the falsification.  To the extent Plaintiff is suggesting the later documents are missing because AK Steel intentionally destroyed the evidence, the allegation is conclusory and rank speculation, and insufficient to raise a genuine issue of fact.  "Although the summary judgment standard requires that evidence of record be viewed in the light most favorable to the nonmoving party, it does not require that all bald assertions and subjective unsupported opinions asserted by the nonmoving party be adopted by a court."  *Steele,* 2012 WL 3028514, at *9; *see also Lattimore,* 2012 WL 208078 at *13.

Therefore, Plaintiff cannot establish a prima facie case of age or race discrimination based on her discharge. Additionally, if Plaintiff could establish a prima facie case, she would not be able to establish that Defendant's legitimate, non-discriminatory reason for her discharge was pretext.

**5) <u>PLAINTIFF'S CLAIMS FOR RETALIATION</u>**

To make a prima facie case of retaliation, Plaintiff must establish that she: (1) engaged in activity protected by Title

---

[11]  Lucy Freeman, the only one of Plaintiff's declarants who remained as a permanent employee after the strike, does not support this assertion. Freeman only says that she "had to go through another physical" and "*may have* filled out more forms."  Freeman Decl., ¶ 7 (emphasis added).

VII; (2) AK Steel knew of the exercise of her civil rights; (3) it took an employment action adverse to her; and (4) there is a causal connection between the protected activity and the adverse employment action. *See Lattimore,* 2012 WL 208078, at *16 (and cases cited therein).

Plaintiff can establish the first three elements without dispute. The protected activities Plaintiff engaged in were: (1) her complaint to AK Steel's Ethics Hotline on January 18, 2008; (2) her EEOC charge filed on March 27, 2008; (3) her complaint to AK Steel's Labor Relations representative Amy Hull on September 30, 2008; and (4) the EEOC settlement agreement reached between Plaintiff and AK Steel on January 27, 2009. Similar to the analysis for race and gender discrimination, Plaintiff alleges three types of "adverse action" – promotion, scheduling, and termination.

### a. Promotion and Scheduling

Plaintiff cannot establish a causal connection between her protected activities and the alleged adverse actions relating to the promotion of Chisholm or Belding's scheduling decisions. A showing of causal connection through circumstantial evidence requires proof that (1) the decision maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made, and (2) there is

a close temporal relationship between the protected activity and the adverse action. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001).

Plaintiff asserts that she was demoted to the position of "floater," in November of 2007. However, Plaintiff engaged in no alleged protected activity prior to November of 2007. Thus, there cannot be a causal connection between any of Plaintiff's protected activities and her alleged demotion to "floater."

Additionally, Defendant made the decision to promote Chisholm over Plaintiff on January 18, 2008. This event was what prompted Plaintiff to engage in her first protected activity when she lodged a complaint with AK Steel's Ethics Hotline. Again, Plaintiff had not engaged in any protected activity prior to Defendant's decision to promote Chisholm. Thus, there cannot be a causal connection between any protected activity and AK Steel's decision to not promote Plaintiff.

### b. Termination

The Court has already established in section 4(c), *supra*, that Plaintiff cannot establish that Defendant's legitimate, non-discriminatory reason for her termination was pretext for race or gender discrimination. Plaintiff similarly cannot establish that Defendant's reason for her termination was a pretext for retaliation. Therefore, Plaintiff's claim for

35

retaliation based on her termination is subject to summary
judgment.

## 6) **PLAINTIFF'S CLAIM UNDER FMLA**

Plaintiff clarifies that her FMLA claim is not based on a
retaliation theory, nor is it based on any injury or disability
to Plaintiff.  *See* Doc. 47 at pg. 12; *see also* Powell-Pickett
Depo. at 83-84 (when defense counsel asked why Plaintiff
believed AK Steel fired her due to "family medical leave," she
did not "recall saying that," and insisted that she was fired in
"retaliation" for filing an EEOC charge).  It is based on the
leave Plaintiff requested in the Fall 2008 to assist her
daughter.  *Id.*

On her FMLA certification form dated September 12, 2008,
and signed by an orthopedist, Plaintiff requested leave for a
finite period of sixteen days between September 10th and
September 26th to deal with the surgery and immediate aftermath.
There is no dispute that she requested, was granted, and took
that leave.  *See* Doc. 48-4 at 4-5.  The narrow basis for the
claim is Plaintiff's request for the unspecified "intermittent"
leave on the FMLA form.  *Id.* at 5.  The form stated that for six
months after the surgery, Plaintiff would need to transport her
daughter one to two times per month for matters such as "office

visits, testing, xrays, . . . physical therapy, medications."
Doc. 48-4 at 5.

Plaintiff believes she was denied leave due to her gender
or race because white males were allowed to use intermittent
leave to help family members.  Doc. 47 at pg. 12.  In response
to Belding's October 1st inquiry, however, about Plaintiff's
"restrictions / FMLA status for the next week," Kelly Nelson
stated Plaintiff "has not been granted FMLA and will not be
until/unless she can provide medical certification for her need
to be off.  The certification that we have on file just allowed
her to be off until Sept 26 and then intermittent leave to take
her daughter to physical therapy."  *See* Powell-Pickett Decl.,
AK00974.

"Among other things, to state and prevail on a claim for
FMLA 'interference,' the employee must have been entitled to
leave, notified the employer of his or her intention to use the
FMLA leave, and be denied the leave."  *Laws,* 828 F. Supp. 2d at
920 (and cases cited therein).  Employees are entitled to take
leave to care for a child's serious medical condition, 28 U.S.C.
§ 2612(a)(1)(C), and that leave can be intermittent so long as
it is medically necessary, *id.,* § 2612(b)(1).  In requesting
this leave, employees must consider the employer's schedule and
provide sufficient notice.

> In any case in which the necessity for leave under subparagraph (C) . . . of subsection (a)(1) of this section . . . is foreseeable based on planned medical treatment, the employee—
>
> (A) shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer . . .; and
>
> (B) shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, . . . except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

*Id.* § 2612(e)(2)(A)-(B); *see also* 29 C.F.R. § 832.303(f) ("Intermittent leave or leave on a reduced leave schedule must be medically necessary due to a serious health condition or a serious injury or illness. An employee shall advise the employer, upon request, of the reasons why the intermittent/reduced leave schedule is necessary and of the schedule for treatment, if applicable. The employee and employer shall attempt to work out a schedule for such leave that meets the employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider.").

Plaintiff makes no allegation, and nothing in the record shows, that she submitted any request for intermittent leave for a particular date for a particular reason within that six-month

window, much less a timely one.  Nothing in the record establishes that AK Steel approved Plaintiff to take intermittent leave at any time during the six months without requesting or properly documenting it.  As such, she fails to establish a prima facie case of FLMA "interference."  *Laws,* 828 F. Supp. 2d at 920.[12]

**7) <u>PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT</u>**

Plaintiff's claim for breach of contract is based on the EEOC settlement agreement in which Plaintiff agreed not to initiate a lawsuit and AK Steel agreed the EEOC proceedings "will not be held against her regarding future assignments and career development."  To prove a breach of contract claim, a plaintiff must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff."  *Nilavar v. Osborn*, 738 N.E.2d 1271, 1281 (Ohio App. 2000) (citing *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio App. 1994)).  Since Plaintiff cannot establish that AK Steel terminated her in retaliation for the EEOC proceedings, she cannot establish that Defendant breached the EEOC settlement agreement.

---

[12] *See also, e.g., Anderson v. Avon Prods., Inc.,* 340 F. App'x 284 (6th Cir. 2009) ("The problem with Anderson's claim is that Avon *did not deny his request for FMLA leave. . . .* Anderson had not submitted any FMLA paperwork"); *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 723 (6th Cir. 2003) ("To invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave.").

Therefore, there are no issues of material fact upon which a reasonable jury could hold AK Steel liable for breach of contract.

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** as follows:

1.    Defendant's motion for summary judgment (Doc. 37) be, and it is, hereby **GRANTED**;

2.    Defendant's motion to strike Plaintiff Powell-Pickett's Declaration (Doc. 53) be, and it is, hereby **GRANTED;**

3.    Plaintiff's motion for leave to file declaration of Lucy Freeman in support of Plaintiff's memorandum in opposition to summary judgment (Doc. 55) be, and it is, hereby **GRANTED**; and

4.    A separate judgment shall enter concurrently herewith.

This 24th day of October, 2012.



Signed By:

*William O. Bertelsman* ᴡᴏʙ

United States District Judge